May it please the court, I am Eric Freitas, counsel for the appellants, the hoods. The federal statutory scheme from which the Disabilities Act comes is a two-pronged system. There must be a disability and there must be a need. That was adopted in the state. The disability definitions pretty much stay the same, whereas the need is defined somewhat differently in California. Generally, it's where services are required because modifications cannot suffice in the classroom. But California had some bad experience when they first enacted the federal law here in California and they adopted two specific sections dealing with two specific disabilities. One is specific learning disability, the other is speech-language impaired, the latter of which is not involved. In the specific learning disability, what you are dealing with is you have a processing disorder which prevents the student from doing as well as the student should be able to do, given the student's IQ. The second thing is that this inability, this discrepancy between what they should be able to do and what they are actually doing, this discrepancy, this 1.5 standard deviation, can't be corrected through services in the regular classroom. The best analogy that I can give to put this in perspective, and it is important because it was a fundamental misunderstanding of this that caused the problems all along. If a student is able at the beginning of a year to lift do an exercise with 5 pounds, and that fits right in with what most of the students in the class are doing, but because that student has a disability, the student should be able to lift 6 pounds but can't. There is a discrepancy of 20%. The student should be able to do 20% higher. If at the end of the year through constant exercise, the student has doubled her capability to now lift 10 pounds, she has certainly made progress. She's certainly keeping up with the class. But without the disability, she would have been able to lift 12 pounds. There is still a 20% gap between what she is able to do and what she should be able to do. Is it the school district's obligation under this law to eliminate the disability? No. It is the Or cure it? No. It is supposed to give services which are reasonably designed to correct, namely reduce. Because if it reduces it, and the gap between the disability and what should be the ability is now less than 1.5 standard deviations, then the student is no longer disabled. The analogy is the gap, the effect of the disability on the student, if it remains consistent over time, the student's disability is not being corrected. Corrected refers to the gap. This one particular disability, that is specific learning disability, is treated differently because the disability is itself a gap. It's the processing disorder keeps the student from doing. You don't have to cure it. You don't have to provide, under Rowley, all you have to do is provide some meaningful benefit to a student to help overcome and Rowley was not an eligibility statute or case, rather. Rowley was just once a student is eligible, how much services do you have to provide? Now, your argument is that those services have to overcome it so that that gap, the percentage is reduced or has to be eliminated? Yes. Under California, which has a different statute, California defines need somewhat differently than does the Federal law, as States are allowed to do. Whether it expands the protection of the law or not, we don't need to get into, but this is the way California defines need and it's been left up to the States to define need. California says you need special education if you have this gap, if what goes on in the classroom won't correct that gap, if it won't narrow it. And in this case, there was a lot of testimony that it could not. And you're saying it has to narrow it so that the percentage is smaller? Yes. Well, where does it have to? So it has to. To less than 1.5 standard deviations, which it's not a. And you have to do everything. Pardon? Otherwise, you have to give the child private education. No. You have to provide some services. For example, this student was acknowledged by everybody in the case to have a visual processing disorder, couldn't use the visual information properly, an auditory processing disorder, a speech-language disorder. All of those things generally require and required in this case private services no, I shouldn't say private services, special education services, which generally schools will provide. They have speech-language therapists. They have audiologists. They do pay for vision therapy. And in this particular case, this district didn't, never considered the statute 56337 of California. What they said was, well, the student doesn't need education. Why? Because, look, the student is making progress. She used to be able to lift five pounds. Now she can lift ten pounds. That's progress. They didn't analyze the fact that the student's disability was keeping her from performing as one would expect her to perform of a gap greater than 1.5 standard deviations. Another analogy would be if a person in a wheelchair was very athletic and was able to jump the wheelchair up over the curb, we don't say that the person in the wheelchair is not entitled to have wheelchair ramps. Yes, they are able to overcome it, but that doesn't mean that they lose their eligibility under the law. The hearing officer never mentioned, never discussed and analyzed whether or not there was a 1.5 standard deviation and whether or not it could be corrected in the classroom or not, because the school district had not done so and he couldn't say the school district was correct when they hadn't engaged in the proper analysis. What the hearing officer said was, well, in addition to discrepancy and need, the two prongs of the state and federal law, there is an additional requirement that the student need special education, but need was already defined by the fact that the discrepancy couldn't be corrected in the regular classroom. So he imposed the second prong a second time. And how did he define need? Need is if she's making progress in the classroom, she doesn't need it. So he did have some special services in the classroom. No, she had modifications. There's a big difference. She had modifications under Section 504 of the Rehabilitation Act, which merely means, for example, she sits up closer to the teacher, she has a little bit more time to take the test, things like that. They're not services. Well, and that the teacher would check on her in various ways because she had a problem doing things on a timely basis or getting her work in, things that the classroom teacher can do. It takes a little more time with the student than other students, but. And those are modifications which are appropriate under the 504 plan. They are also appropriate under an IDEA. But the question is, are those additional attentions narrowing the gap, overcoming the disability? And the answer in the school district, the school district never answered it because they never addressed the question. The hearing officer never addressed the question. They only looked at the fact that she was able to do better this year than last year. She was making some progress. She was able to lift more weight, if you will. The hearing officer did not consider the statute. He merely applied need and defined need his own way. The district court, which should have made a de novo review of the record and looked at the evidence to see if the statute was satisfied, seems to have handled this just as an appeal. He looked to see whether the hearing officer applied the correct standard of law, which the hearing officer had not, and the court seemed to realize that. So the court goes through the decision, looking for something, and found two sentences in the entire hearing officer's 16- or 20-page decision that mentions the fact, the discrepancy can be corrected. And the court does this as if to say, look, the hearing officer considered the correct standard. What the court said was, the hearing officer, Petitioner's expert, this is the hearing officer talking and being quoted by the district court, the Petitioner's expert testified that the discrepancies could not be corrected through services offered in the regular education program. That's the second prong of 56337. The hearing officer was not convinced of that. Again, that was the hearing officer's language. Now, what the court left out was the very next sentence by the hearing officer, which shows that he wasn't talking about narrowing the gap. The very next sentence was, I'll repeat the previous sentence for the flow, the hearing officer was not convinced of that. The classroom accommodations must have been helping Anna to continue to make progress in the general curriculum. In other words, he, the hearing officer, was merely saying, well, it was been – I'm not convinced that it's not being corrected. Why not? Well, because she's able to lift more weight. But that says nothing about the fact that she's not able to lift any closer to what she should be able to lift. The gap, the discrepancy is not being corrected. And that's what the section talks about. The discrepancy must be able to be corrected in – through services listed – developed in the classroom. The hearing officer could not logically have found that the discrepancy could be corrected in the classroom. The hearing officer is not an expert. He is a judge who listens to the expert testimony and reaches a conclusion based on the testimony. The school district never even approached the subject of discrepancy or correction in the classroom. They based their non-eligibility on an entire different point, which is not – section which is not the section which applies. So he didn't consider it – excuse me, the school district didn't consider it. None of their witnesses testified that it could be corrected, whereas five experts on behalf of the petitioner testified that it could not be corrected through services delivered in the classroom. A developmental optometrist, an audiologist, a speech-language pathologist, a neuropsychologist, and an educational psychologist all said this girl has processing disorders that must be addressed through services delivered outside the classroom. This is the only way we're going to fix this gap. It's not going to be done by moving her to the front of the class or giving her a little bit more time. That is modifications. It means services. If a school district recognized the argument that you just made – this is obviously a hypothetical question – provided special education services to the child, and the end of the year the gap has not been closed, you have to – and actually during the year, you do have to go back and see whether or not what you thought was going to do the job is not enough, and you have to give more. You can't just say, well, it's not working, so we're going to keep doing it. So – but at the time, you don't measure it by seeing whether or not it is successful. But you do see whether it is successful to determine whether or not you're going to continue it, and whether or not she's even eligible. If they had given her any services, made her eligible for special education and given her services, and that closed her discrepancy from 1.5 – it was actually over 1.5 – to 1.3, she would no longer have been eligible under the SLD category because her discrepancy would no longer have been considered a disability. But they didn't do that. All they did was look to see the fact that she is improving. The same thing with the second category of OHI, other health impaired. The school district agreed she had some chronic problem. It was either seizure disorder or ADHD. They didn't know. And it was causing – excuse me – it was causing problems in her attention. And they conceded that it was adversely affecting her education. So under the OHI category, she was also eligible. There was all the testament. There was no dispute at the hearing of either of these facts. Neither discrepancy, 1.5, everybody agreed to that. The fact that our witnesses said that it couldn't be corrected in the classroom, their witnesses had no idea because they'd never considered it. And as far as OHI, the school and our experts said she's got the disability and it is adversely affecting her. But the school district denied it on the grounds that, well, she's able to keep up with her class. Keeping up with the class has been held by the Supreme Court in Rowley not to determine whether or not what's being delivered to a special ed kid is even appropriate, let alone making the student not eligible. Amy Rowley, who was the student in the Rowley case, was an A student. She was getting some special ed services and she was an A student. And she was still found eligible for special ed because she had a disability that qualified her. You don't become not eligible for the IDEA because you're able to work harder and overcome your disability and be able to keep up with your class. It is not a tutoring statute. It's a disability statute. Roberts. I think you teed up your argument very well. Did you want to save a little time for rebuttal? My understanding is that I have 20 minutes. You have 20 minutes. You can use it any way you want. I'll use a little bit more to make a couple more points. Okay. This hearing officer's decision is not entitled to any deference. He made up his own legal standards. He did not refer to any law. This Court should be doing a de novo review as well. He ignored both sides. He became his own expert. He started interpreting the tests and he got it wrong. He can't do that. He can't go back to his office and talk to other people. The district court did not analyze any evidence. The district court merely looked at the hearing officer's opinion and said, well, the hearing officer did talk about cannot be corrected. But as we see, the hearing officer said, I'm not convinced of that, which ignored all the evidence, and the reason he wasn't convinced of it is because he was confusing whether or not it can be corrected with whether or not there was progress. I would just point out one last thing at this point while reserving the rest of the other five minutes for rebuttal. At the district court and at this Court, it is a trial de novo based on the administrative hearing. That's because the IDEA is different than most other appeals from administrative decisions. The Court gives due deference where it's thorough and clear, which it was not here from the hearing officer, but otherwise weighs the evidence themselves, which I realize puts some of the burden on you. I would just reference the fact that there is the evidence is laid out in our points and authorities to the district court. There simply weren't enough pages in the brief to this Court to lay out the evidence where all the testimony was. One would expect that if the school district, the appellee, was trying to support the hearing officer's decision in the district court and the district court's decision in this Court, they would cite some law showing that the interpretations of those two lower tribunals was correct. At the district court level, they cited one case improperly because it was an unpublished decision, and they cited no other cases, and they made reference to no evidence whatsoever from the hearing. In this Court, they have cited eight cases. Four of them merely go to the issue of whether or not who has the burden of proof, and there's no issue as to who has the burden of proof. And by the way, the Schaeffer v. Wiest case has not changed the burden of proof in eligibility cases. Schaeffer v. Wiest limited its holding to where a party is challenging the sufficiency of an IEP. This is not – no one is challenging the sufficiency. The Ninth Circuit cases of Palliup remains the law. The burden was on the district at the hearing officer level to show that the child was not eligible. Of the other eight cases, of the other four, two are dealing with the standard of review. One is dealing with – two are dealing with the fact that you don't go to legislative history when the statute is not ambiguous, and one is dealing with that a special level that students should be mainstreamed in the general classroom whenever possible. They have cited not one case supporting their position that the law was interpreted properly, nor have they made any reference in the brief to this Court of any evidence whatsoever to support either the hearing officer's decision or the district court's decision. With your permission, I'll reserve the rest. Roberts. We have a little over three minutes. We'll hear from the school district at this time. Good morning. My name is Jack Sleeth. I have the honor of representing the Encinitas Union School District. Good morning. If it pleases the Court, he's right. We didn't cite a whole lot of cases because there aren't a lot of cases. But I would argue one point in particular first off. There is no corroborating evidence to support the severe discrepancy calculation mathematically. And that's an important analysis. And it hasn't been addressed really effectively in the briefs. But I would refer the Court to the hearing officer's decision at page 1228 where he says the district did not base its denial of eligibility on a finding that there was no discrepancy. We all agreed that there was a discrepancy. Rather, it was the district's position that Anna's overall performance, including classroom achievement, grades, and SAT 9 testing, not only failed to provide the necessary corroboration, but also demonstrated that she did not require special education. That particular sentence goes directly to the bottom part of the mathematical passage. The Court may remember my rather painful brief on how to calculate 1.5 standard deviation. I'll make a couple of other points about that in a moment. But the bottom part of the sentence, after you go through the three steps in 3030 of the regulation in Title V, after you go through the three steps in mathematics, it says if you get the severe discrepancy, it's a severe discrepancy when corroborated by other evidence. And in this case, he specifically found that there was no corroboration. School districts have been told repeatedly by both Congress and by our legislature in California that we are not to rely on any one single testing criterion to determine if a child is or is not disabled. In this particular case, this young lady was arguably a genius. A great deal of the fight went on, in this case, over both the evidence and in the argument, to determine whether she had a 127 IQ or a 131 IQ. She needed to have her IQ be larger in order to make the discrepancy greater. This case is an issue where we're trying to find out if there is a difference between her testability and her performance that is, let me simplify the language, too large. If that discrepancy is too large, she's required to be provided with special education by the school district. They had a bottom line. They had her tested scores. They were trying to make her appear to be more intelligent. All of their experts were arguing she had a 131 IQ. The hearing officer decided on a slightly lower IQ, probably far greater than mine. But that doesn't really reach the issue. The issue here is whether the severity of the discrepancy was too large. And then if you do the math, you still have to corroborate it with something else. All of her classroom teachers said they never thought of her as a special ed student. All of our experts at the district said she was not a special ed student. She didn't require special education. Now, counsel argues a lot about the difference between the trial court's decision that the district attempted to address the disability instead of using the word corrected. The statute said we must correct, and the trial court said they addressed it. I thought that it was very telling that the trial court put a large footnote in that section of the opinion discussing that particular argument because it's a big debate in this case. He said that addressing or correcting is an issue of time. This school district only had one shot at this little girl. We did an assessment, and we determined that she had a disability, there was a discrepancy, and we thought we could provide an appropriate education to her in the classroom, making modifications not to the curriculum but to the arrangements in the classroom under 504. And we made a 504 plan, and very soon thereafter, her parents took her out of school and put her in a private school. So we really didn't have an opportunity to find out if our program, our plan under 504, had really corrected. It certainly addressed, but we didn't know if it had corrected it because we had built a plan, but we needed some time to see if it would actually work. And I think that the meaning of the word correct, and he's right, I don't have any case law on this, but I think the meaning and the legislative intent of both Congress and the State of California in using a word like correct is we need to build a plan that's reasonably calculated to provide, to deliver some education that will provide a benefit to the student. And we did that, but we didn't have her long enough to be able to determine if it actually worked. There is some tiny amount of evidence, and I can cite it to the Court, if it would be helpful at all. It's in the first volume of the excerpt of the record at page 129. The director of the program says that she had heard the parents saying that there was some slight improvement in Anna's attention after the 504 plan had been put in. But there was substantial other evidence indicating that there was no improvement. We just didn't have time to be able to determine whether or not the evidence was sufficient to prove that either way. The primary issue that we've been talking about here is the special education classification of specific learning disability, which requires the severe discrepancy in all of that math out there. I think that if the legislature had intended the distinction to be made using 22.5, the number that we were talking about all through this, they would have said 22.5. They didn't say 22.5. The legislature of the state of California and the regulation gives us a long, I said that wrong, it's not the state of California's legislature, it's the regulation, gives us a long mathematical analysis and tells us how to do 1.5 standard deviations adjusted by four correction points. They didn't say 22.5 points because it's different for every test. Could a school district say to a child, this is obviously a hypothetical question, could a school district say to a child and his or her parents, we recognize that you are in fact eligible for special education, but our teachers are so good and our classrooms are so excellent that we think inside that classroom we can do the same or better than special education can provide? Could a school district do that? Well, not correctly, no. The first part of the sentence, you're eligible for special education, includes a component to determine whether or not we can provide the education in the regular education classroom. Under 56029, one of the analysis that we need to make, yes, we have a disability. Can we provide the education in the regular classroom without modified curriculum? That's the determination whether the child is entitled to special education. So the first part of your hypothetical would be wrong. She's not entitled to special education because we are so good that we can provide her with an education in the regular ed classroom. And if we were right about that, it would be correct to deny special education. Your argument is that the statutory framework, state and federal, requires the district to make the determination whether the regular classroom can do the job, if you will. And in this case, you didn't have the time to do that. That's a significant part of our argument on specific learning disability, yes. And the three statutes really that say that are 56026 that says the impairment, the A paragraph says there's a disability, the B paragraph says the impairment, as described in A, requires instruction services or boards that cannot be provided with modifications in the regular school program. That means regular education can't do it. So there's a disability, regular education can't do it. And the shorthand way that I have always taught this when I'm teaching it to people is 504 requires you to modify the room or the seat or the arrangement. Special education requires you to modify the curriculum. And if we don't need to modify the curriculum and we can provide realistically some education to the child that meets the Rowley test for providing a specific benefit, then the child doesn't need special education. That's the first test. But then they echo the same language in 56337 where the C subparagraph, 56337, is the specific learning disability statute in California. It says a pupil shall be assessed as having a specific learning disability if, A, and they list a number of things, the discrepancy is, I'm sorry, they list a number of things that can be bothered like oral expression or listening comprehension. Then they say the disability is due to a disorder in one or more of the basic psychological processes. And then in C they echo that earlier language in 56026, the discrepancy cannot be corrected. That's where we got the word corrected. Through other regular or categorical services offered within the regular instruction program. So they keep bringing us back to whether or not we can provide the necessary instruction or whether we can correct the discrepancy in the regular education classroom. So then there's the other point, and that is in 3030, the regulation that deals specifically with how to calculate how to do the math. 3030J says after the one, you take some numbers, and then two, you put the numbers together. It's beyond me how the regulators thought that educators even were going to be able to do this. But after you do all the math, if there is more than 1.5 standard deviation, plus or minus 4 corrected, then you have a severe discrepancy, it says, when such discrepancy is corroborated by other assessments. And the other assessment data, which may include tests, scales, instruments, observations, work samples. So what we have here is a deviation. We have a discrepancy. We have performance that's not as good as what she appears to be able to do. But there is no corroborating evidence that the testing that shows the discrepancy really means that she needs special education services. And all of the teachers thought she was progressing fine, which is why they were talking about progressing. They thought they were providing her with an education. The psychologists thought that the discrepancy was not sufficient, and we got into a quibble in reviewing the evidence you may see, that she didn't think the discrepancy should be based on subparts of the test. And the psychologist was arguing about whether you could use subparts to get to the discrepancy. But we can see that there are discrepancies in the testing procedure. But that doesn't get you to the issue of whether the disability is causing a severe discrepancy for which there is corroborating evidence. There just isn't any corroborating evidence. It's equally possible that this little girl likes to read and hates math and isn't going to do that math and isn't going to bring her homework home. And her seizure disorder has nothing whatsoever to do with it. So on an analysis of the evidence, there's no corroborating evidence to support it. So she's not got a severe discrepancy that's corroborated. So she's not disabled for the purposes of specific learning disability. In the briefs, we haven't argued much about OHI, the other handicapped impaired standard. But that requires a disability with evidence that the disability caused her limited strength, vitality, alertness, which then there's a second part, adversely affects the educational performance. Again, the hearing officer in the trial court reviewing the evidence determined that they did not see evidence that, while she may have had limited strength, vitality, or alertness, it adversely affected her ability, her educational performance are the words of the statute. She was making very good grades in most of her classes. The discrepancy was between genius level work and above average work, somewhere around 110. Better than most people perform. So that same analysis that was used over there would be applied to determine whether she had limited strength that adversely affected her educational performance. All of her teachers agreed. All of the specialists at the district agreed that she had a disability, but it didn't affect her ability to obtain the educational benefits that were there or affect her educational performance. Thank you. Okay. Rebuttal? Yes, thank you, Your Honor. I wonder if you wouldn't mind beginning by addressing the point that opposing counsel made, that the determination of eligibility for special education treatment includes the school district making its own, making a determination that the classroom cannot provide what the student needs, and that in this instance the school district simply didn't have the time to do that. Didn't have the time, I'm sorry? Well, that's the argument we heard. Oh, I see. Okay. Yes. Now I understand. That is disproven by the evidence. What he has just argued is we offered her a 504 plan, but they pulled the student and we never had an opportunity to show that the 504 accommodations in the classroom would have corrected this discrepancy. The 504 plan had been in effect for two years already, and this girl had the discrepancy at the end of the two years. That's why her parents were screaming and hollering. She had a 504 plan. That's very clear. They were already making accommodations in the classroom, and at the end of two years when she was struggling twice as much time to do her homework, the teachers were noting that she wasn't completing her homework, that she wasn't paying attention in class, that she was spacing out. This dovetails with the other argument he's saying that there was no corroborating evidence. Baloney. All the problems that she was having in class were evidence, were corroborating evidence, of her disability. They tried to fix it by moving her in the classroom, by moving her closer to the board, by having the teacher face her and talk to her to try and keep her attention. It wasn't working. For two years it didn't work. No, Your Honor. The teachers testified that it was sufficient to allow her to keep up with the class. All that means is, look, two years ago she was able to lift 5 pounds. She's able to lift 10 pounds now. Pardon? It would be better if we had something besides pounds. Oh, well, she's getting C's. She's always been getting C's. She's keeping up with the classroom. Well, she wasn't getting C's. C's and some B's. She had a subject for math or something where she got it. Or she had a spelling. Spelling she had a C. There were certain grades that were, certain courses which were affected more by her disabilities than others. She had a language deficit. So any courses that involved a language processing caused problems. Courses where she had to look from the board to her paper. She didn't have the visual motor ability to switch back and forth, reading, things like that. But Your Honor's point to address it, they wanted to continue to do the same thing that they had done for two years again. It hadn't worked. At the end of those two years, the discrepancy was still more than 1.5 standard deviations. He seems to be arguing that we're asking for this girl who's a genius to get more. She's already doing better than most other kids. That's the point that they are making. If you're doing okay, you're not disabled. If you're able to get up the ramp, even though the ramp is too steep, you're not disabled if you're in a wheelchair. If you can walk upstairs or get up the curb by jumping the curb, you're not disabled. But that's not the law. You do not address specific learning disability and thereby satisfy the law. You have to have things in the classroom to correct the disability. And they're trying to switch the language. You need to wind up. Yes. It sounds like you're done. Thank you. Thank both counsel for the argument. Well briefed, very well argued. We always appreciate that. Thank you very much. Case disargued will be submitted for decision.
judges: Kennedy , Hall, Hawkins